UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INVENTIV HEALTH CONSULTING, INC.,
    Plaintiff,

    v.                              CIVIL ACTION NO.
                                       17-10410-MBB

EQUITAS LIFE SCIENCES, ALAN D. FRENCH,
PRIYA GOGIA, SUMMER ATKINSON, JASON DEBASITIS,
and DENNIS MELETICHE,
    Defendants.

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION TO REMAND OR, ALTERNATIVELY, JURISDICTIONAL**
**DISCOVERY (DOCKET ENTRY # 17); DEFENDANT'S MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM (DOCKET ENTRY # 4); DEFENDANTS'**
**MOTION TO TRANSFER VENUE (DOCKET ENTRY # 6)**

**December 22, 2017**

**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties,
plaintiff inVentiv Health Consulting, Inc. ("plaintiff") and
defendants Equitas Life Sciences, LLC ("Equitas"), Alan D. French
("French"), Priya Gogia ("Gogia"), Summer Atkinson ("Atkinson"),
Jason Debasitis ("Debasitis"), and Dennis Meletiche ("Meletiche")
(collectively, "defendants").  Plaintiff seeks to remand this
action pursuant to 28 U.S.C. § 1447(c) or, alternatively, to
conduct limited jurisdictional discovery.  (Docket Entry # 17).
Defendants oppose the motion to remand.  (Docket Entry # 20).
Meletiche filed a motion to dismiss under Fed. R. Civ. P.
12(b)(6) ("Rule 12(b)(6)") (Docket Entry # 4) and French, Gogia,
Atkinson, and Debasitis (collectively, "Former Employees") as

well as Equitas filed a motion to transfer venue pursuant to 28
U.S.C. § 1404(a). (Docket Entry # 6). After conducting a
hearing on September 6, 2017, this court took the motions (Docket
Entry ## 4, 6, 17) under advisement.

PROCEDURAL HISTORY

On March 2, 2017, plaintiff filed a complaint in
Massachusetts Superior Court Department (Middlesex County)
against the Former Employees, Equitas, and Meletiche. (Docket
Entry # 1-1). Plaintiff alleges that defendants engaged in a
civil conspiracy to form Equitas, a company that would compete
with plaintiff, "secretly take inVentiv's clients," and
"misappropriate [its] trade secrets." (Docket Entry # 1-1).

The complaint sets out the following claims: tortious
interference with contractual relations against Equitas (Count
I); tortious interference with contractual relations against
French (Count II); tortious interference with advantageous
business relations against all defendants (Count III); trade
secret misappropriation under the common law and Massachusetts
General Laws chapter 93, section 42 ("chapter 93") against
Equitas and the Former Employees (Count IV);[1] unfair or deceptive
trade practices in violation of Massachusetts General Laws
chapter 93A, section 11 ("chapter 93A"), against Equitas and the

_____

[1] In the complaint, Count IV is erroneously listed as a second
Count III.

2

Former Employees (Count V);[2] and civil conspiracy against all
defendants (Count VI).[3]  (Docket Entry # 1-1).

On March 13, 2017, defendants removed this action on the
basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332,
1441, and 1446.  (Docket Entry # 1).  Debasitis and Meletiche,
however, defeat diversity jurisdiction because, as Massachusetts
residents, they are citizens of Massachusetts.  See 28 U.S.C. §
1441(b)(2).  Defendants therefore contend that plaintiff
fraudulently joined Debasitis and Meletiche and diversity
jurisdiction is therefore proper.  (Docket Entry # 1).  Plaintiff
moves to remand this action on the basis that defendants fail to
demonstrate fraudulent joinder.  (Docket Entry # 17).

<u>FACTUAL BACKGROUND</u>

Plaintiff is incorporated in North Carolina with a principal
place of business in Raleigh, North Carolina.  (Docket Entry # 1-
1).  Equitas is a Delaware limited liability company with a
principal place of business in Cambridge, Massachusetts.  (Docket
Entry # 1-1).  Defendants assert that Equitas' members are not
citizens of Massachusetts.[4]

---

[2]  Because the complaint lists two Count IIIs, Count V is
mislabeled as Count IV.
[3]  Because the complaint lists two Count IIIs, Count VI is
mislabeled as Count V.
[4]  "The citizenship of a limited liability company 'is determined
by the citizenship of all of its members.'"  <u>D.B. Zwirn Special
Opportunities Fund, L.P. v. Mehrotra</u>, 661 F.3d 124, 125 (1st

Plaintiff provides "strategic management consulting services to biopharmaceutical and medical technology companies." (Docket Entry # 1-1). Plaintiff's clients are pharmaceutical and/or biotechnology companies, medical device companies, and diagnostics companies in North America, Europe, and Japan. (Docket Entry # 1-1). Plaintiff's consulting services include:

> [N]ew product planning for development-stage assets, launch planning for assets in the critical product launch window, strategy development and tactical solutions for in-line products, portfolio strategy, and organizational development.

(Docket Entry # 1-1). Plaintiff also helps clients develop commercialization strategies and market development plans for new products. (Docket Entry # 1-1). Over 85% of plaintiff's business consists of repeat clients. (Docket Entry # 1-1). Plaintiff's employees bear responsibility for developing and maintaining relationships with its clients. (Docket Entry # 1-1). Plaintiff invested "considerable amounts of time, money and effort" to maintain and develop goodwill with its clients. (Docket Entry # 1-1).

According to the complaint, throughout the course of its business, plaintiff "developed, accumulated, maintained, and refined trade secrets and other confidential and proprietary

---

Cir. 2011) (quoting Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54 (1st Cir. 2006)).

4

information" at "great expense." (Docket Entry # 1-1). Such

trade secrets and information include:

> [B]usiness plans, account plans, business policies, client
> proposals, client deliverables, financial plans and
> forecasts, research, pricing information, business
> forecasts, product information, expert data and reports,
> business strategies, statements of work, market access
> strategies, value propositions, client and prospect lists
> and information, client usage, data sources, industry and
> company analyses, market information and analysis,
> methodologies, templates, techniques, and other information
> relating to inVentiv, its clients, and its contractors . .
> ..

(Docket Entry # 1-1). Plaintiff protects its trade secrets and

confidential and proprietary information on secure, password-

protected computer systems. (Docket Entry # 1-1). Plaintiff

terminates its employees' access to such systems "immediately

upon termination of employment" and requires the employees to

return company property and information upon termination.

(Docket Entry # 1-1). Plaintiff also requires employees to sign

an employment agreement, which includes covenants regarding

confidentiality, noncompete, and/or nonsolicitation. (Docket

Entry # 1-1). The confidentiality covenants specifically

restrict former employees from disclosing plaintiff's

confidential information. (Docket Entry # 1-1). Debasitis'

employment agreement contained a forum selection clause that

states:

> This Agreement shall be subject to and governed by the laws
> of the State of North Carolina, without regard to the
> conflicts of law rules of such states. All disputes

pertaining to this Agreement shall be decided exclusively by
        a state or federal court located in Wake County, North
        Carolina, and Employee hereby consents to personal
        jurisdiction of such courts.

(Docket Entry # 1-1, Ex. A).

        French formerly served as a managing director for plaintiff.

(Docket Entry # 1-1).  In this role, French supervised a number

of plaintiff's employees, including other Former Employees.

(Docket Entry # 1-1).  While employed by plaintiff, each of the

Former Employees signed an employment agreement, which included

restrictive covenants regarding the "confidentiality and

protection of inVentiv's information," customer relationships,

and goodwill.  (Docket Entry # 1-1, Ex. A).  The employment

agreements also contained noncompete covenants, which prohibited

the Former Employees from "competing against inVentiv for at

least one year" following termination of employment.  (Docket

Entry # 1-1).  The confidentially restriction prohibited the

Former Employees from disclosing confidential information

belonging to plaintiff, or "using such information on behalf of

anyone other than inVentiv."  (Docket Entry # 1-1).

        From 2013 to 2016, French served as the primary point of

contact for two of plaintiff's clients ("the Clients"), with whom

plaintiff had relationships prior to French's involvement.

(Docket Entry # 1-1).  The Clients generated "several million

dollars" in revenue for plaintiff between 2013 and 2016.  (Docket

                              6

Entry # 1-1). One of the Clients, "Client A," was plaintiff's second largest client in terms of annual revenue and, from 2014 to 2015, plaintiff's revenue from Client A significantly increased. (Docket Entry # 1-1). While employed by plaintiff, French worked on a specific project for Client A called "Project One."

Meletiche was employed by Client A during the time that Client A was plaintiff's client. (Docket Entry # 1-1). In or around "the summer of 2014," French informed plaintiff's employee, Keith Kelly ("Kelly"), about a discussion or discussions with Meletiche concerning the formation of a new health economics and outcomes research company. (Docket Entry # 18-2). According to Kelly's affidavit, a health economics and outcomes research company provides companies in pharmaceutical and biotech industries with information needed to "demonstrate the value of their innovations to providers, healthcare decision makers, payers, and ultimately, stakeholders."[5] (Docket Entry # 18-2). Kelly told French that he was not interested in joining a new company, but would speak with Meletiche about the opportunity as a courtesy. (Docket Entry # 18-2). Kelly subsequently spoke to both Meletiche and French, at which time Meletiche asked Kelly if he would be interested in joining Meletiche to start a health

---

[5] Plaintiff began offering health economics and research services in November 2015. (Docket Entry # 18-2).

economics and outcomes research company. (Docket Entry # 18-2).
Kelly declined Meletiche's offer. (Docket Entry # 18-2).

French and Meletiche incorporated Equitas more than a year
later on November 3, 2015, at which time French was still
employed by plaintiff. (Docket Entry # 1-1). French requested
to work part time for plaintiff in November 2015, citing his
desire to "devote more time to completing his doctorate."
(Docket Entry # 1-1). Plaintiff approved French's request, after
which French began working part time in or around February 2016.
(Docket Entry # 1-1). The complaint alleges that French
requested to work part time in order to devote more time to
Equitas. (Docket Entry # 1-1).

Equitas' application for registration, filed with the
Massachusetts "Secretary of the Commonwealth Corporations
Division," lists French and Meletiche as the founding members of
Equitas and Equitas' focus as "'consulting in the life sciences
industry.'" (Docket Entry # 1-1, Ex. B). The domain name
"equitasls.com" was created on December 3, 2015. (Docket Entry #
1-1). On December 17, 2017, Equitas applied for an H-1B Visa to
allow Equitas to hire a foreign worker to fill a managing
director position. (Docket Entry # 1-1). The H-1B Visa
application listed Meletiche's home as Equitas' business address.
(Docket Entry # 1-1). Equitas' principal place of business was

located in Meletiche's home as recently as February 2017. (Docket Entry # 1-1).

In early 2016, French informed plaintiff that business with Client A "was winding down." (Docket Entry # 1-1). Plaintiff subsequently experienced a corresponding decline in revenue from Client A. (Docket Entry # 1-1). Beginning in January 2016, several of plaintiff's employees, supervised by French, began submitting resignations. (Docket Entry # 1-1). Gogia resigned as of January 15, 2016, stating that she needed "to take out some time to both focus on her family and take a break to think about her career direction." (Docket Entry # 1-1).

On March 22, 2016, Client A sent an email to French at his Equitas email, "adf@equitasls.com," at which time French was still employed by plaintiff. (Docket Entry # 1-1). French neither sought nor obtained authorization from plaintiff to work on behalf of Equitas or to perform work for Client A on the side. (Docket Entry # 1-1).

On May 25, 2016, Equitas posted a classified advertisement seeking a managing director, which directed applicants to send applications to Meletiche's home address. (Docket Entry # 1-1). The advertisement described the managing director's role as, among other responsibilities, "[s]erv[ing] as a subject-matter expert at global prices" and market access, including "European, Asian, & Latin American" markets. (Docket Entry # 1-1). As set

out in the advertisement, Equitas required applicants to have a master's degree in "health policy, health care [management], public health, health econ[omics], pharmacy/biotech, bus[iness] admin[istration], or a relevant discipline . . .." (Docket Entry # 1-1). The advertisement further required a minimum six years of management consulting experience "focusing on the pharmaceutical/biotech industry." (Docket Entry # 1-1).

Atkinson resigned as of May 27, 2016, citing her desire to "enter graduate school." (Docket Entry # 1-1). Around June 2106, French requested an unpaid leave of absence claiming he "was dealing with family medical issues that were causing him stress." (Docket Entry # 1-1). French's unpaid leave lasted approximately six weeks. (Docket Entry # 1-1). On June 3, 2016, Equitas amended its application for registration with the Massachusetts Secretary of the Commonwealth Corporations Division naming Kerry Seagle as Equitas' sole manager. (Docket Entry # 1-1, Ex. B).

Debasitis resigned as of July 8, 2016, claiming a personal reason for "why [he] sought employment elsewhere." (Docket Entry # 1-1). French resigned as of July 25, 2016 to "focus on [his] own health and wellbeing." (Docket Entry # 1-1). In total, between January 15 and July 25, 2016, eight of plaintiff's employees resigned "citing personal reasons for their departure." (Docket Entry # 1-1).

The complaint asserts, upon information and belief, that French orchestrated "at least some of" plaintiff's employees' resignations and encouraged the Former Employees to work for Equitas. (Docket Entry # 1-1). None of the Former Employees informed plaintiff that they were resigning to work for Equitas and each of the Former Employees began working for Equitas after resigning. (Docket Entry # 1-1).

On January 18, 2017, plaintiff received an electronic calendar invitation from Client A. (Docket Entry # 1-1). The calendar invitation was addressed to French's previous inVentiv email address, "Alan.French@inventivhealth.com." (Docket Entry # 1-1). The calendar invitation was also addressed to Atkinson at "ssa@equitasls.com" and Gogia at "pmg@equitasls.com." (Docket Entry # 1-1). On January 19, 2017, a Client A employee addressed an email to French's previous inVentiv email address and Atkinson's Equitas email address. (Docket Entry # 1-1). This second email concerned work on Project One by both Client A and Equitas. (Docket Entry # 1-1). It was this second email, according to the complaint, that provided the first indication to plaintiff that the Former Employees were employed by Equitas and that French, Gogia, and Atkinson were working with Client A on Project One. (Docket Entry # 1-1).

Plaintiff performed forensic analysis of the computers previously used by certain Former Employees. (Docket Entry # 1-

1).  Plaintiff discovered that French accessed plaintiff's confidential information on July 23, 2016, two days prior to his resignation.  (Docket Entry # 1-1).  When French accessed such confidential information, he immediately inserted a USB device into the computer.  (Docket Entry # 1-1).  Plaintiff contends that the USB device could be used to transport a copy of confidential information elsewhere.  (Docket Entry # 1-1).  Based on these findings, the complaint alleges that defendants used, or are currently using, plaintiff's confidential information and goodwill in connection with operating Equitas.  (Docket Entry # Docket Entry # 1-1).

On January 24, 2017, plaintiff delivered demand letters to French, Gogia, and Atkinson.  (Docket Entry # 1-1).  The letters stated that French, Gogia, and Atkinson were working for Equitas in violation of their employment agreements with plaintiff.  (Docket Entry # 1-1).  The letters requested a written response by January 27, 2017.  (Docket Entry # 1-1).  The response from the Former Employees was to include:  "a description of their work for Equitas"; "written assurance that they will honor their obligations to inVentiv and not solicit or service any clients of inVentiv – including Client A"; "written assurances that they will not solicit other employees of inVentiv to leave the company"; "written assurances that they will cease and desist from further solicitation of, or work for, inVentiv's clients,

including the Clients"; and "written assurances that they have returned or destroyed all confidential or proprietary information, as well as other information, that belongs to inVentiv." (Docket Entry # 1-1). French, Gogia, and Atkinson responded to the demand letters on February 16, 2017, but did not provide the requested information or the written assurances. (Docket Entry # 1-1). Two weeks later, plaintiff filed the complaint in Massachusetts Superior Court (Middlesex County). (Docket Entry # 1-1).

DISCUSSION

I.  Jurisdiction and Standard of Review

In general, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed" by a defendant to federal court. 28 U.S.C. § 1441.  This court has original, diversity jurisdiction over state law claims where the amount in controversy exceeds $75,000 and where there is "complete diversity among the parties."  28 U.S.C. § 1332; Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373 (1978).  Where, as here, a defendant "is a citizen of the state in which [the] action is brought," 28 U.S.C. § 1441(b)(2) precludes removal.

Plaintiff, however, "may not thwart the exercise of a defendant's right of removal by fraudulently joining a non-diverse defendant who has no real connection to the case."  In re

_Fresenius Granuflo/Naturalyte Dialysate Prods. Liability Litig._,
76 F. Supp. 3d 321, 322 (D. Mass. 2015).  As explained by the
First Circuit:

> [U]nder the doctrine of fraudulent joinder, removal is not
> defeated by the joinder of a non-diverse defendant where
> there is no reasonable possibility that the state's highest
> court would find the complaint states a cause of action upon
> which relief may be granted.

_Universal Truck & Equip Co., Inc. v. Southworth-Milton, Inc._, 765
F.3d 103, 108 (1st Cir. 2014).  Stated differently, "'if
plaintiff fails to state a cause of action against a resident
defendant and the failure is obvious according to the settled
rules of the state, the joinder of the resident defendant is
fraudulent.'"  _In re: Stryker Lift v. 40 Femoral Head Products
Liability Litigation_, 2017 WL 3815937, at *1 (D. Mass. Aug. 31,
2017) (quoting _Universal Truck_, 765 F.3d at 108 n.3).  More
specifically, defendants must establish:

> [B]y clear and convincing evidence either that there has
> been outright fraud committed in the plaintiff's pleadings,
> or that there is no possibility, based on the pleadings,
> that the plaintiff can state a cause of action against the
> non-diverse defendant in state court.

_Suburban Realty Co., Inc. v. Cuna Mutual Group & Cumis_, No. 16–
40073–TSH, 2017 WL 1164491 at *1 (D. Mass. 2017) (citing _Mills v.
Allegiance Healthcare Corp._, 178 F. Supp. 2d 1, 5 (D. Mass. 2001)
(adopting Second Circuit test articulated in _Whitaker v. Am.
Telecasting, Inc._, 261 F.3d 196, 207 (2nd Cir. 2001), and quoting

Whitaker); see In re New Eng. Mut. Life Ins. Co. Sales Practices Litigation, 324 F. Supp. 2d 288, 298 (D. Mass. 2004) (recognizing use of Whitaker by judges in this district); see also Universal Truck, 765 F.3d at 108.

The doctrine of fraudulent joinder requires this court to consider whether "there is no reasonable possibility that the state's highest court would find that the complaint states a cause of action upon which relief may be granted against the non-diverse defendant." In re: Stryker Lift, 2017 WL 3815937, at *1; see also Universal Truck, 765 F.3d at 108. The linchpin of this analysis is whether "joinder of the non-diverse party has a reasonable basis in law and fact." Mills, 178 F. Supp. 2d at 4. Stated another way, a non-diverse party is fraudulently joined "if existing state law squarely precludes a plaintiff's claim against a non-diverse defendant, and such deficiency is 'apparent from the face of the original complaint.'" Rosbeck v. Corin Group, PLC, 140 F. Supp. 3d 197, 202 (D. Mass. 2015). Therefore, a defendant's burden to prove fraudulent joinder is often cited as "heavy." Id.; see, e.g., Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 461 (2d Cir. 1998) ("defendant seeking removal bears a heavy burden of proving fraudulent joinder"); Phillips v. Medtronic, Inc., 754 F. Supp. 2d 211, 217 (D. Mass. 2010).

A fraudulent joinder analysis is similar to a Rule 12(b)(6) analysis, but is "more lenient than that for a motion to

dismiss." Rosbeck, 140 F. Supp. 3d at 203 (citing Mayes v.
Rapoport, 198 F.3d 457, 466 n.16 (4th Cir. 1999)). When
assessing a claim of fraudulent joinder, the court "is not bound
by the allegations in the complaint, and may consider affidavits
and other materials that bear on the question of whether there is
a reasonable basis for joinder of a defendant." Suburban Realty
Co., 2017 WL 1164491, at *2; Mills 178 F. Supp. 2d at 6; see also
Badon v. RJR Nabisco Inc., 236 F.3d 282, 285 n.3 (5th Cir. 2000)
(considering "undisputed summary judgment type evidence" when
determining whether any reasonable possibility of recovery under
state law existed); Antony v. Duty Free Americas, Inc., 705 F.
Supp. 2d 112, 115 (D. Mass. 2010) ("fraudulent joinder doctrine
provides an exception to the general rule prohibiting courts from
considering evidence extrinsic to the facts in the complaint")
(citing Mills, 178 F. Supp. 2d at 6). Furthermore, "in
determining whether a plaintiff has the possibility of recovery
against a defendant, the court is to resolve all disputed issues
of fact and ambiguities in favor of the non-removing party."
Suburban Realty Co., No. 16-40073-TSH, 2017 WL 1164491, at *2
(citing Fabiano Shoe Co., Inc. v. Black Diamond Equipment, Ltd.,
41 F. Supp. 2d 70, 71-72 (D. Mass. 1999)).

## II.  Plaintiff's Arguments

Plaintiff contends that this case must be remanded pursuant
to 28 U.S.C. § 1447(c) because diversity of citizenship does not

lie between the parties and plaintiff only asserted Massachusetts statutory and common law claims. (Docket Entry # 17). Defendants counter that the complaint fails to allege sufficient facts to state any claim for relief against Meletiche and, therefore, plaintiff fraudulently joined Meletiche and cannot rely on his joinder to defeat diversity jurisdiction. (Docket Entry # 20). Defendants further maintain that the forum selection clause in Debasitis' employment agreement dictates that plaintiff may only bring claims against Debasitis in North Carolina and, accordingly, plaintiff fraudulently joined Debasitis. (Docket Entry # 20).

A. Tortious Interference with Business Relations against Meletiche

Plaintiff asserts a tortious interference with advantageous business relations claim and a civil conspiracy claim against Meletiche. (Docket Entry # 18). With respect to the tortious interference claim, defendants initially argue that plaintiff fails to allege that Meletiche ever "personally engaged in any business contact with any of [p]laintiff's customers on behalf of Equitas." (Docket Entry # 20) (emphasis in original). Defendants note that plaintiff did not list Meletiche as one of the Former Employees and did not include Meletiche in the allegation that Equitas and the Former Employees failed to comply with their "'contractual, common law, and statutory

obligations.'" (Docket Entry # 20) (quoting Docket Entry # 1-1,
¶ 85).

Plaintiff counters that the complaint "alleges sufficient
facts to support a claim for tortious interference against
Meletiche." (Docket Entry # 24). Plaintiff points out that it
had a "beneficial business relationship with Client A," Meletiche
knew of the relationship, and he "misappropriated inVentiv's
confidential information," and currently uses such confidential
information to service plaintiff's former clients. (Docket Entry
# 24). Plaintiff further contends that Meletiche, along with the
other defendants, used plaintiff's relationships to divert
business away from plaintiff, which constitutes intentional
interference with "advantageous business relationships." (Docket
Entry # 24).

Under the doctrine of fraudulent joinder, "'removal is not
defeated by the joinder of a non-diverse defendant where there is
no reasonable possibility that the state's highest court would
find that the complaint states a cause of action upon which
relief may be granted against the non-diverse defendant.'" In
re: Stryker, 2017 WL 3815937, at * 1 (quoting Universal Trucking
Co., 765 F.3d at 108). In analyzing whether there is a
"reasonable possibility" that the Massachusetts Supreme Judicial
Court would find that the complaint states a cause of action, it
is necessary to examine the required elements of an interference

with advantageous business relations claim.  Those elements are as follows:

> "(1) [T]he plaintiff has a business relationship for economic benefit with a third party, (2) the defendants knew of that relationship, (3) the defendant interfered with that relationship through improper motive or means, and (4) the plaintiff's loss of the advantage resulted directly from the defendants' conduct."

Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 864 N.E. 2d 518, 541 (Mass. App. Ct. 2007) (quoting McName v. Jenkins, 754 N.E. 2d 740, 745 (Mass. App. Ct. 2001)); see Swanset Development Corp. v. City of Taunton, 668 N.E. 2d 333, 338 (Mass. 1996) (citing United Truck Leasing Corp. v. Geltman, 551 N.E. 2d 20 (Mass. 1990)).

Under the first element, a defendant's interference must be with an advantageous business relationship between plaintiff and a third party.  See Cavicchi v. Koski, 855 N.E. 2d 1137, 1141 (Mass. App. Ct. 2006); Guest-Tek Interactive Entertainment Inc. v. Pullen, 731 F. Supp. 2d at 80, 86 (D. Mass. 2010).  Thus, to satisfy the first element, "'the plaintiff must prove that he had a business relationship for economic benefit with a third party.'"  Cavicchi v. Koski, 855 N.E. 2d at 1141 (setting out elements of a "'claim for interference with advantageous business relations'"); Guest-Tek Interactive Entertainment Inc. v. Pullen, 731 F. Supp. 2d at 86.  Here, plaintiff sufficiently demonstrates a "relationship for economic benefit with a third party,"

specifically with the Clients, including Client A.  Cavicchi v. Koski, 855 N.E.2d at 1141; (Docket Entry # 1-1).  The complaint states that plaintiff's economic benefit from the Clients, specifically Client A, constituted "several million dollars in revenue for inVentiv."  (Docket Entry # 1-1).  With respect to the second element, the complaint sufficiently alleges that Meletiche knew of plaintiff's relationship with the Clients, including Client A, because Meletiche was employed by Client A at the same time Client A conducted business with plaintiff. (Docket Entry # 1-1).

Regarding the third element of an "improper motive or means," the improper conduct must extend "'beyond the interference itself.'"  Cavicchi v. Koski, 855 N.E. 2d at 1142; accord United Truck Leasing Corp. v. Geltman, 551 N.E. 2d at 23-24; James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co., 112 F.3d 1240, 1250 (1st Cir. 1997) (plaintiff "must demonstrate wrongfulness beyond the interference itself").  Violation of "a statute or a rule of common law" or use of threats, misrepresentations of facts or "other improper means" provides a sufficient improper motive or means.  United Truck Leasing Crop. V. Geltman, 551 N.E. 2d at 24; Bhammer v. Loomis, Sayles & Co., Inc., No. 15-14213-FDS, 2016 WL 3892371, at *7 (D. Mass. July 14, 2016) (finding it "well-established" that "a

misrepresentation is an improper means of interference") (citing Draghetti v. Chmielewski, 626 N.E.2d 862, 869 (Mass. 1994)). Further, the standard considers the use of "improper motive or improper means; the plaintiff need not prove both." Kurker v. Hill, 689 N.E. 2d 833, 838 (Mass. App. Ct. 1998). A "legitimate advancement of [defendant's] own economic interest" does not constitute an improper motive. Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 815 N.E. 2d 241, 246 (Mass. App. Ct. 2004); see United Truck Leasing Corp v. Geltman, 551 N.E. 2d at 24 (defendant's motives "to benefit his customers and himself financially" are insufficient); see, e.g., TalentBurst Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 269 (D. Mass. 2008) ("offering of a job to a competitor's at-will employee, including one that provides better pay and benefits, does not as a matter of law constitute improper means").

Courts, however, inquire whether the defendant "interfered with a restrictive covenant governing a competitor's employee" and such interference "creates a presumption that [the defendant] had an improper motive." TalentBurst Inc., 567 F. Supp. 2d at 269. For example, in the context of a motion to dismiss, an improper motive exists "'where plaintiff has established that it had a non-competition agreement with [its former employee], and that the defendants . . . solicited [the employee] to leave the plaintiff to accept employment with [the

21

defendant], it has stated a sufficient cause of action to survive a motion to dismiss.'" Id. at 269 (quoting Cambridge Internet Sols. Inc. v. Avicon Group, No. 99-1841, 1999 WL 959673, at *3 (Mass. Sept. 21, 1999)) (brackets in original). Although TalentBurst addressed a tortious interference with contractual relations claim rather than a tortious interference with an advantageous business relations claim, the elements of the two torts are similar.[6]  See Coyle v. Kittredge Ins. Agency, Inc., No. 12-40014-TSH, 2014 WL 1330859, at *9 (D. Mass. Mar. 28, 2014) (noting that "substantive elements of tortious interference with contractual relationships and tortious interference with advantageous business relationships are substantially similar") (citing Cavicchi v. Koski, 855 N.E.2d at 1141).  Notably, "The same knowledge and improper means that are required to prove a claim for interference with an existing contract are also required to prove a claim for interference with a prospective or advantageous business relationship." Holmes Products Corp. v. Dana Lighting, Inc., 958 F. Supp. 27, 32 (D. Mass. 1997) (collecting cases).

Defendants' argument that Meletiche did not contact any of plaintiff's customers is misguided in light of the facts and

---

[6] "An 'advantageous relation[,]'" however, "is a 'contemplated contract' or prospective business relationship." Buster v. George W. Moore, Inc., 783 N.E.2d 399, 416 (Mass. 2003).

reasonable inferences in the complaint. Meletiche founded a
competing company and operated it out of his home. (Docket
Entry # 1-1). Drawing reasonable inferences, <u>see</u> <u>In re:
Stryker</u>, 2017 WL 3815937, at *1, he was intimately familiar with
Equitas and its operations. Indeed, Meletiche's home served as
the principle business address for Equitas. Meletiche spoke to
Kelly, plaintiff's employee, about joining a new company
covering the same business as plaintiff, i.e., health economics
and research, albeit in the summer of 2014. (Docket Entry # 18-
2). French, a co-founder of Equitas along with Meletiche,
accessed and likely copied plaintiff's confidential information
shortly before French resigned. The Former Employees left
plaintiff to work at Equitas. French, plaintiff's managing
director prior to his resignation, likely knew about the
restrictive covenants in the Former Employee's employment
agreements due, in part, to the pretextual reasons the Former
Employees gave for their resignations. Meletiche worked for
Client A when it was one of plaintiff's major clients. French
communicated with Client A through his Equitas email address and
Client A worked with Equitas on Project One.

A reasonable possibility exists that Meletiche improperly
solicited one or more of the Former Employees to leave plaintiff
in order to work for Equitas in violation of their noncompetition
agreements. Meletiche's reasonably inferred intimate familiarity

with Equitas and his relationship with French render it more than a reasonable possibility that French informed Meletiche about the noncompete restriction in one or more of the Former Employee's employment agreements. The reasonable possibility of an improper motive on the part of Meletiche is further bolstered by the Kelly affidavit, which demonstrates that Meletiche spoke to at least one of plaintiff's employees about the prospect of leaving plaintiff to join a new company covering the same business as plaintiff. (Docket Entry # 18-2). With respect to the fourth element, the complaint states that plaintiff experienced a decline in its advantageous and economically beneficial relationship with Client A, and other clients, as a result of Meletiche's and the other defendants' actions. (Docket Entry # 1-1).

Hence, although defendants are correct that the complaint did not include Meletiche as a "Former Employee" or in certain allegations of wrongdoing, the complaint and the record as a whole presents a reasonable possibility of a tortious interference with business relations claim against Meletiche. Based on the facts set out in the factual background, there is a "reasonable possibility that the state's highest court would find that the complaint states a cause of action" for tortious interference with business relations against Meletiche. In re: Stryker, 2017 WL 3815937, at *1. Indeed, defendants fail to show

no reasonable possibility not only by clear and convincing evidence, but also by a lesser preponderance of the evidence standard.

2.  Civil Conspiracy by Meletiche

Plaintiff also alleges that Meletiche committed civil conspiracy because he was aware of plaintiff's restrictive covenants by virtue of his "long-standing working relationship with French" and his role, together with French, in forming Equitas. (Docket Entry # 18). Plaintiff submits that Meletiche used, or at least knew the other defendants were using, plaintiff's confidential information to service plaintiff's clients, namely Client A. (Docket Entry # 18). Furthermore, plaintiff argues that Meletiche provided "substantial assistance in furthering the scheme" because "he founded Equitas, hired the Former Employees, and runs Equitas from his home." (Docket Entry # 18).

Defendants dispute such allegations, claiming that plaintiff was required to, and failed, to show "substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." (Docket Entry # 20); (citing Kurker v. Hill, 689 N.E. 2d 833 (Mass. App. Ct. 1998)). Defendants also assert that plaintiff did not allege that Meletiche accessed "[p]laintiff's purportedly confidential information, used such information, took any steps to attract

clients to Equitas or even encouraged any of the other Defendants to do so." (Docket Entry # 20). Defendants maintain that, without such allegations, "[p]laintiff cannot state a claim of civil conspiracy against Mr. Meletiche, individually." (Docket Entry # 20). Defendants further argue that Kelly's affidavit undercuts plaintiff's civil conspiracy claim because it depicts conduct in 2014. (Docket Entry # 20). Defendants contend that plaintiff "fails to explain how any action Mr. Meletiche undertook in 2014 can possibly shed any substantive light on actions he allegedly took two years later." (Docket Entry # 20). Defendants note that, while Kelly "declined Mr. Meletiche's entreaty," Kelly's affidavit does not show that Kelly mentioned any restrictive covenants to Meletiche in 2014 "as a reason for declining the opportunity." (Docket Entry # 20).

To establish a civil conspiracy, plaintiff must "show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement." Bartle v. Berry, 953 N.E. 2d 243, 253 (Mass. App. Ct. 2011); accord Orellana v. Deutsche Bank National Trust Co., No. 12-11982–NMG, 2013 WL 5348596, at *11 (D. Mass. Aug. 30, 2013) ("[t]he concerted action theory of civil conspiracy requires an underlying tort"); see Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d 1546, 1565 (1st Cir. 1994). This "form of

26

civil conspiracy" imposes liability "on one individual for the tort of another."  <u>Kurker v. Hill</u>, 689 N.E. 2d 833, 836 (Mass. App. Ct. 1998); <u>see</u> <u>Grant v. John Hancock Mut. Life Ins. Co.</u>, 183 F. Supp. 2d 344, 363 (D. Mass. 2002) ("'defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement'"); <u>see</u> <u>also</u> <u>Metropolitan Property and Casualty Ins. Co. v. Boston Regional Physical Therapy, Inc.</u>, 550 F. Supp. 2d 199, 203 (D. Mass. 2008); <u>Massachusetts Laborer's Health & Welfare Fund v. Philip Morris, Inc.</u>, 62 F. Supp. 2d 236, 244 (D. Mass. 1999) ("a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement").  Furthermore, under the doctrine of fraudulent joinder, "'all disputed questions of fact and any ambiguities in the current controlling substantive law'" must be resolved in plaintiff's favor.  <u>In re: Stryker</u>, 2017 WL 3815937, at *1 (quoting <u>Phillips v. Medtronic, Inc.</u>, 754 F. Supp. 2d at 215); <u>see</u> <u>also</u> <u>Suburban Realty Co.</u>, 2017 WL 1164491, at *2 (citing <u>Fabiano Shoe Co.</u>, 41 F. Supp. 2d at 71-72).

With respect to defendants' allegation that Meletiche did not provide any "substantial assistance" in assisting with a "tortious plan," as established above, there is a reasonable possibility that Meletiche engaged in tortious interference with

plaintiff's advantageous business relations and such tortious interference satisfies the "underlying tort" requirement for civil conspiracy. <u>See</u> <u>Orellana</u>, 2013 WL 5348596, at *11 ("[t]he concerted action theory of civil conspiracy requires an underlying tort"). More to the point, the complaint reflects a reasonable possibility that Meletiche engaged in substantial assistance in furtherance of a common design. Meletiche incorporated Equitas together with French on November 3, 2015 and, together with French, spoke to at least one of plaintiff's employees, Kelly, about leaving plaintiff to join a new company in the summer of 2014. (Docket Entry # 18-2). Meletiche worked for Client A while Client A was serviced by French in his capacity as a managing director for plaintiff. (Docket Entry # 1-1). Although defendants argue that Meletiche's actions in 2014 cannot shed light on Meletiche's actions two years later, as previously stated and drawing reasonable inferences from the facts in the complaint, Meletiche was intimately familiar with Equitas and communicated with French, who likely knew about the restrictive covenants. Together, these facts demonstrate a "reasonable possibility" that Meletiche acted in concert with French and/or the Former Employees in furtherance of a common design. Furthermore, any ambiguities with respect to the alleged facts in the complaint regarding civil conspiracy, are resolved

in favor of plaintiff.  See In re: Stryker, 2017 WL 3815937, at
* 1.

In sum, based on the facts in the complaint, there is a
reasonable possibility that the Massachusetts Supreme Judicial
Court would find that the "complaint states a cause of action
upon which relief may be granted against the non-diverse
defendant," Meletiche, both as to the interference with business
relations claim and the civil conspiracy claim.  In re: Stryker,
2017 WL 3815937 at *1.  In light of the foregoing, Meletiche, is
properly joined and diversity jurisdiction is therefore lacking.
See 28 U.S.C. § 1441(b)(2).  It is therefore not necessary to
address the reasonable possibility vis-à-vis the claims against
Debasitis.  Furthermore, because a remand is required and this
court lacks diversity jurisdiction, this court declines to
address either the motion to dismiss (Docket Entry # 4) or the
motion to transfer venue (Docket Entry # 6).

### CONCLUSION

In accordance with the foregoing discussion, the motion to
remand (Docket Entry # 17) is **ALLOWED** and this case is **REMANDED**
to the Massachusetts Superior Court Department (Middlesex
County).  In light of the remand and lack of diversity
jurisdiction, this court declines to address either the motion to

dismiss (Docket Entry # 4) or the motion to transfer venue

(Docket Entry # 6).

                                   /s/ Marianne B. Bowler
                                   **MARIANNE B. BOWLER**
                                   United States Magistrate Judge